PETER DERNIER and NICOLE DERNIER,   :
                                     :
        Plaintiffs,                  :
                                     :
        v.                           :   Case No. 2:16-cv-000230
                                     :
U.S. BANK NATIONAL ASSOCIATION AS   :
TRUSTEE FOR CSMC MORTGAGE-BACKED    :
PASS-THROUGH CERTIFICATES, SERIES   :
2006-3, MORTGAGE NETWORK, INC., and:
ROBERT A. MCINNES,                   :
                                     :
        DefendantS.                  :

## OPINION AND ORDER

## Introduction

This case arises from Plaintiffs Peter and Nicole Dernier's
attempt to identify the beneficial owner of the mortgage
promissory note for the loan on their home, following their
intentional failure to make payments on the note. After a
lengthy procedural history before the Vermont courts, the
Windsor County Superior Court granted Plaintiffs' motion to
amend their complaint to permit the homeowners to bring
additional claims against various defendant banking
institutions. Defendant U.S. Bank National Association ("USB")
removed the case to this Court on August 22, 2016.  On November
8, 2016, Defendants Mortgage Network, Inc. ("MNI") and Robert A.
McInnes ("McInnes") moved to dismiss the Plaintiffs' sole claim

against them of "Conspiracy to Commit Fraud and Fraud." ECF 134. For the reasons outlined below, the Court grants Defendants' motion to dismiss both claims, without prejudice to future requests for leave to amend.

## Factual and Procedural Background

Plaintiffs' Third Amended Complaint alleges irregularities in the transfer of both the note and the mortgage on their home. Plaintiffs claim that these irregularities resulted in confusion concerning who was authorized to modify the principle on their mortgage, receive payments on their note and, eventually, to foreclose on their property. After filing the original complaint in this action seeking to evidence the beneficial owner of their mortgage loan, Plaintiffs allege that they "uncovered a fraudulent scheme perpetrated by the banking industry . . . whereby they would exchange unendorsed promissory notes, hold them and only assign them to a particular trust once in default." ECF 111-5, p. 2. According to Plaintiffs, "the trust in which their loan was eventually placed was a dumping ground for defaulted loans as a means to collect the trust's pooling insurance money for the benefit of the servicer of the trust and to allow the servicers of the trust to foreclose on the defaulted properties and keep the proceeds of any sales of the foreclosed properties." *Id.*

In relation to these allegations, Plaintiffs lay out the following facts. First, Plaintiffs purchased a home in Weston, Vermont in 2005. Kittredge Mortgage Corporation ("Kittredge") loaned Plaintiffs $242,250 for the purchase, and Peter Dernier executed a promissory note and a mortgage in favor of Kittredge on October 7, 2005. Kittredge immediately assigned the promissory note and mortgage to MNI. Later that fall, MNI informed the Derniers that the servicing for their loan would be transferred to Select Portfolio Servicing ("SPS"), and in April 2006, SPS notified them that it had "assigned, sold or transferred the servicing" to America's Servicing Company ("ASC"). In the spring of 2007, Plaintiffs sought a modification of the principle balance of their mortgage from ASC in response to well-water contamination discovered on their property. ASC allegedly informed Plaintiffs that they could only qualify for a modification if the loan was in default, and Plaintiffs ceased making loan payments at ASC's direction. Once the loan was in default, ASC informed Plaintiffs that the investor of the promissory note needed to agree to the modification.

At Plaintiffs' request, ASC produced a copy of the promissory note containing a specific indorsement from MNI to USB on February 26, 2009. *Id.* at 5. However, "the nature and context of the purported signature on the indorsement . . . immediately raised the suspicions of the Derniers." *Id.* In fact,

the note that was produced purportedly bears two indorsements:
one from Kittredge to MNI, and one from MNI in blank, which
bears a signature mark over a stamp and the name "Chad M.
Goodwin," below.  In April 2014, Plaintiffs obtained a signed,
notarized affidavit from Chad M. Goodwin, stating that he was an
employee of MNI from 2000 to 2013, and that the signature
superimposed over the stamp is not his own.

In addition, after the Derniers filed their initial suit,
attorney Josh Lobe, as counsel for USB, forwarded a letter to
Plaintiffs with a copy of the promissory note bearing an
indorsement from MNI to USB. *Id.* at 6. However, between late
2013 and early 2015, Plaintiffs received separate copies of the
original promissory note from SPS, ASC and MNI, respectively,
none of which contained either the stamp or signature
indorsement in blank from MNI or the typewritten specific
indorsement to USB. *Id.* at 10. Thus, Plaintiffs allege that "USB
created the fraudulent documents as a means to show it is the
holder of the note," *Id.* at 7, and that "MNI did not sell the
Derniers' loan to . . . USB." *Id.* at 8.

In addition, Attorney Lobe also forwarded an assignment of
the mortgage "from MERS as nominee for Kittredge to a trust with
a similar name as the Trust for which USB is a trustee in this
matter," and claimed USB had authority to foreclose on the loan.
*Id.* at 6. However, the date of the assignment of the mortgage

which allegedly provided USB with standing to foreclose (March 18, 2011) occurred after ASC forwarded its file to outside counsel to initiate foreclosure proceedings. *Id.* at 11. Moreover, the trust named on this assignment of the mortgage differed from the name of the trust on the note. In addition, Plaintiffs claim that ASC did not have the assignment from MERS to USB when they asked ASC for investor information on November 5, 2012. As such, the Plaintiffs claim that "upon information and belief, the March 18, 2011 Assignment of Mortgage was created and forged by Attorney Lobe's office." *Id.* at 11. Finally, they allege that "in August, 2013, ASC caused an assignment of mortgage from MERS as nominee for MNI to be recorded in the Town of Weston Land Records transferring the mortgage from MNI to USB," even though "the mortgage was not assigned directly by MNI to USB." *Id.* at 12.

Finally, the Plaintiffs allege that "USB did not pay value for the Note and is therefore not a holder in due course of the Dernier loan." *Id.* at 13. Rather, the documents provided by USB as evidence of a financial transaction underlying the transfer of the note –identified as an "MNI Wire Transfer Receipt" and documents related to a "Pooling and Servicing Agreement (PSA)" for the trust (of which USB was presumably trustee) –do not indicate that USB paid value for the note. Rather, the MNI Wire Transfer Receipt "purportedly notes the Dernier loan as part of

bulk sale by MNI to an unidentified purchaser" and "shows payment from an unidentified payee" dated December 5, 2005. *Id.* However, the specific indorsement from MNI lists a trust that "was not established or filed with the SEC until March 1, 2006 at the earliest." *Id.* at 15. Furthermore, according to the complaint, USB stated that it acquired the Dernier note from the depositor named in the PSA, which is identified in the PSA as "Credit Suisse First Boston Mortgage Securities Corp." However, "the Derniers' note does not bear any intervening indorsements reflecting conveyance of the Note from the depositor or seller listed on the PSA." *Id.* at 14.

Finally, Plaintiffs assert that "on June 29, 2016, [McInnes], on behalf of MNI, executed a Ratification and Consent ("Ratification") of the forged MNI stamp indorsement and forged signature of Chad M. Goodwin and attached it to the version of the Note with the specific indorsement from MNI to USB." *Id.* at 15. However, they claim that in reality, "MNI did not indorse or intend to indorse the Note to USB as Trustee when it received payment from an unidentified payer in December 2005 because there was no such trust by that name at that time." *Id.* Nor was the note indorsed in blank at that time. Rather, they allege that USB provided the note with the forged indorsement to MNI, and that "USB requested the Ratification from MNI for the purpose of satisfying the UCC requirement to become a holder of

the Note." *Id.* at 16. Thus, neither the forged indorsement stamp from MNI nor the forged signature of Mr. Goodwin were applied by another agent of MNI.

The last allegation in Plaintiffs' complaint is that the Derniers' payments on their loan to ASC "were not deposited in a specific account for the Trust which purportedly held their Note," leaving them with "no expectation that payments actually were applied to the certificateholders of the trust and properly credited." *Id.* at 17. In addition, Plaintiffs allege that "ASC had no right to seek collection from the Derniers for the Note on behalf of USB." *Id.* at 18. Furthermore, Plaintiffs assert that USB's negative reports about the Derniers to credit bureaus were fraudulent.

In light of the foregoing assertions, the Derniers brought claims for declaratory judgment seeking to quiet title on their property and a discharge of their mortgage. They also brought claims of unjust enrichment, common law fraud, mail fraud and RICO violations, violations of the Fair Debt Collection Practices Act and Fair Credit Reporting Act against USB. Finally, they brought a count of conspiracy to commit fraud and fraud against USB, MNI and McInnes, alleging that these Defendants "conspired to ratify a forged indorsement in order for USB to claim ownership of the Note," even though "USB knew the endorsement on the note was a forgery." *Id.* at 21. They

assert that "the fraudulent Ratification has caused injury to Plaintiffs by allowing USB to claim it's the holder of the note and seek collection on a debt for which it paid no value." *Id.* at 22. Defendants McInnes and MNI moved to dismiss this last claim, arguing that (1) Plaintiffs failed to allege that MNI and McInnes acted in concert with USB to use illegal means to obtain an unlawful result, thereby precluding the conspiracy claim; and (2) Plaintiffs' fraud claim is defective because it does not contain allegations supporting the required elements of reliance and damages. Plaintiffs argue that they have sufficiently pled both claims, and assert that they should be granted leave to amend the complaint if the Court finds the allegations to be insufficient.

**Discussion**

*1.    Standard of review for motion to dismiss*

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "where the well-pleaded facts do not permit the court to infer

8

more than the mere possibility of misconduct, the complaint has
alleged—but it has not shown—that the pleader is entitled to
relief." *Id.* at 679. In addition, "a pleading that offers labels
and conclusions or a formulaic recitation of the elements of a
cause of action will not do." *Id.* at 678 (internal quotation
omitted). The "working principle" underlying this rule is that
"the tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal
conclusions. Threadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not
suffice." *Id.* Thus, in considering a motion to dismiss, a court
may proceed by first "identifying pleadings that, because they
are no more than conclusions, are not entitled to the assumption
of truth," and then determining whether the remaining, well-
pleaded factual allegations, would plausibly give rise to an
entitlement to relief. *Id.*[1]

In addition, Plaintiffs alleging fraud must satisfy the
pleading requirements set out in Fed. R. Civ. P. 9(b), which
reads:

> In alleging fraud or mistake, a party must state with
> particularity the circumstances constituting fraud or
> mistake. Malice, intent, knowledge, and other conditions of
> a person's mind may be alleged generally.

---

[1] "In considering a motion to dismiss for failure to state a claim pursuant to
Rule 12(b)(6), a district court may consider the facts alleged in the
complaint, documents attached to the complaint as exhibits, and documents
incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104, 111 (2d Cir. 2010) (internal quotation omitted).

"In essence, Rule 9(b) places two further burdens on fraud plaintiffs—the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state. As to the first, [the Second Circuit] has held that the complaint must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. As to the second, though mental states may be pleaded generally, Plaintiffs must nonetheless allege facts that give rise to a strong inference of fraudulent intent." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015) (internal quotations omitted). "Essentially, while Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (quoting *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)).

*2.    Fraud*

The Derniers bring a claim of common-law fraud against USB, MNI and McInnes in connection with the Ratification of the

allegedly-forged instrument. "To maintain a cause of action for fraud, plaintiff must demonstrate five elements: (1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed. Failure to prove any one of the five elements defeats the fraud claim." *Felis v. Downs Rachlin Martin PLLC*, 133 A.3d 836, 842 (Vt. 2015) (quoting *Estate of Alden v. Dee,* 35 A.3d 950 (Vt. 2011)).

According to Defendants, the Third Amended Complaint "does not state the particular allegedly false statements or allegedly intentional misrepresentations of a material fact . . . upon which Plaintiffs relied, and . . . does not state how Plaintiffs have been damaged as a result." ECF 134, p. 15. Specifically, Defendants argue that but for MNI and McInnes' alleged ratification, USB would still have claimed ownership of the note and the right to foreclose on the Derniers' property, and thus that Plaintiffs could not have "relied" on the ratification. In contrast, Plaintiffs assert that, in deciding to file this action challenging USB's legal right to collect on the note and foreclose on the property, they relied (1) on MNI's representation that it sold their loan to Credit Suisse and not USB; (2) on MNI's production of a copy of the note from its file, which did not contain either the specific indorsement to

USB or an indorsement in blank; and (3) MNI's claim that it was fully compensated for the loan, without disclosing by whom. It was then prejudiced by MNI's subsequent Ratification, which foreclosed the legal argument they had previously developed against USB on the basis of MNI's prior representations. In reply, Defendants point to a D.C. District Court decision for the proposition that the cost of consulting legal counsel in response to a false statement does not itself constitute detrimental reliance. ECF 141, p. 8-9 (citing *Busby v. Capital One, N.A.*, 772 F.Supp.2d 268, 276 (D.D.C. 2016)).

The Court need not address the applicability of *Busby* to conclude that Plaintiffs have failed to sufficiently plead reliance in the complaint. First, the Plaintiffs initially filed an action seeking a declaratory judgment regarding the ownership of their note as a consequence of their own suspicion that the indorsement in blank by Chad Goodwin was a forgery. *See* ECF 111-5, p. 5-6. The representations that they purport MNI made to them by producing documents inconsistent with that indorsement in blank occurred after Plaintiffs decided not to make further payments on their note and to file the action in state court instead. Moreover, with regard to their failure to repay their loan, Plaintiffs essentially contend that they relied on ASC's advice in making this decision, ostensibly as a mechanism to obtain a modification of their mortgage. In this sense, the

prior representations made by MNI were not the initial cause behind the lawsuit or Plaintiffs' failure to repay under the Third Amended Complaint, and Plaintiffs therefore could not have relied on them in initially bringing this action.

Even if the Plaintiffs had properly alleged that they relied on MNI's documentary disclosures (aside from the Ratification) in continuing to challenge USB's legal rights under the note, the nature of the Plaintiffs' investigation in this case would preclude a finding that the reliance element of fraud was met. The Vermont Supreme Court has "held that where it is clear from the full text of a representation or from facts about the relationship of the parties that reliance should only follow an independent inquiry, such an inquiry must be made." *Silva v. Stevens*, 589 A.2d 852, 858 (Vt. 1991) (citing *Winton v. Johnson & Dix Fuel Corp.*, 515 A.2d 371, 374 (Vt. 1986)). Where one party sends "signals that would lead a reasonable [person] *not* to rely on [a particular] assumption . . . but, to the contrary, to investigate further," then the other party's reliance on that assumption is not justified, and cannot give rise to a fraud claim. *Sugarline Assocs. v. Alpen Assocs.*, 586 A.2d 1115, 1120 (Vt. 1990). Similarly, any purported reliance on documents produced by MNI in this case would not be justified, since they directly contradict other documents produced by ASC

and USB. Rather, the contrasting document production would give rise to the Derniers' obligation to investigate further.

Furthermore, Plaintiffs fail to demonstrate how they specifically relied on the Ratification. Rather, they seem to imply that they would be harmed by *this Court's* reliance on the Ratification in adjudicating the legal dispute at issue. However, the Vermont Supreme Court has expressly rejected the doctrine of third-party reliance in the context of an allegation that a court relied on a fraudulent statement, thereby harming a party as a litigant. *See Felis v. Downs Rachlin Martin PLLC*, 133 A.3d 836, 845 (Vt. 2015) ("We can find no case where a court has accepted a third-party reliance claim on the basis that the reliance was by the court and the plaintiff was a litigant who had a full opportunity to respond to the allegedly fraudulent evidence. We need not determine whether we ever would accept a third-party reliance theory in a fraud case to hold that we would not accept it on the factual situation here.").

Here, Defendants' effort to obtain a ratification appears to be a deliberate attempt to ensure the enforceability of the Note. In the state court's summary judgment opinion and order which preceded removal to this Court, the court first noted that "a finder of fact could conclude that the indorsement was forged, and that, therefore, the note is not a bearer instrument. Further, a finder of fact could infer that because

the indorsement was forged, the Defendant's possession of the note is wrongful. In such an eventuality, Mortgage Network, Inc. would have the right to enforce the note, not [USB]." ECF 65, p. 4. However, the court also acknowledged that "a forged signature can be ratified for all purposes of Article 3" under §3-403. Shortly thereafter, the Defendants produced the Ratification, which states that MNI "ratifies and approves the indorsement of the Note by Chad M. Goodwin," and that MNI "was fully compensated for the transfer of the Note and . . . hereby waives and/or releases any claim it may have on the Note." ECF 111-5, p. 138. In short, the Ratification appears to be directly responsive to the dicta in the state court decision, and intended to preclude a conclusion that the Note is not a bearer instrument, that USB's possession of the note is wrongful or that MNI rather than USB would have the right to enforce the note. Such a conclusion, however, would be made by this Court in litigation, and would harm the Plaintiffs indirectly as litigants, rather than by virtue of their own reliance. As such, the prospect of such a result would not suffice to meet the reliance element of a fraud claim.

Second, Defendants contend that the allegation that Plaintiffs have been damaged by USB's seeking to collect on the note is too conclusory to meet required pleading standards. Plaintiffs argue that "by providing USB with the improper

Ratification, MNI has damaged the Derniers by giving the thief (USB) the ability to collect on the stolen Note." ECF 140, p. 11. In addition, they have been damaged by "their reliance on the purported ownership trail because they have improperly paid an unlawful owner of the Note prior to going into default in order to determine the rightful owner[,] which destroyed their credit rating." *Id.* "Had MNI actually sold the Note to USB in 2005 and informed the Derniers of such sale, this action would never have come to fruition and the Derniers would have merely sought to modify their loan with USB." *Id.* In reply, Defendants argue that the fact that the Ratification operates to preclude a finding that the note was "lost or stolen," and thereby prevents Plaintiffs from defending against USB's collection or possible foreclosure claims, merely resolves a legal question but does not constitute "damage" to Plaintiffs.

The harm identified by Plaintiffs' first allegation –that USB would now be entitled to collect on the note –rests on a theory of third-party reliance by this Court, which cannot stand under Vermont law. The second form of harm identified by Plaintiffs rests on an assumption that is not contemplated by the Third Amended Complaint: that is, that the failure to make payments on the loan was done to determine the rightful owner of the Note, rather than to meet a prerequisite for loan modification following the discovery of well-water

contamination, as alleged in the complaint. The third form of
harm —that the action itself was caused by MNI's failure to
inform the Derniers that it did not own the note or mortgage and
that USB owned it instead —fails to acknowledge the long
procedural history of this matter before the state courts. In
fact, in response to the first complaint, MNI asserted that it
had been named in error because it "did not own the right to the
mortgage in question." ECF 49, p. 3. Around this time, USB sent
the Plaintiffs a letter asserting its own rights over the
mortgage and note. Plaintiffs' amended complaint addressed only
claims against USB. *Id.* at 5. Thus, far from the action being
premised on the Derniers' lack of awareness of USB's interest,
it appears to be structured largely around MNI's representations
that ownership had been transferred and USB's claims of its
legal rights to the note and mortgage. Thus, Plaintiffs fail to
point to any type of harm caused by their justifiable reliance
which suffices to give rise to a fraud claim under state law.
Since Plaintiffs have failed to satisfy the reliance and damages
elements of fraud in their pleadings, the Court must grant the
Defendant's motion to dismiss this claim.

3.    *Conspiracy*

       Defendants raise a preliminary concern about whether a
claim of civil conspiracy is available in Vermont. In a non-
precedential order issued by a three-judge panel, the Vermont

Supreme Court has questioned whether such a cause of action continues to exist in the state. *See Davis v. Vile*, No. 2002-465, 2003 WL 25746021, at *3 (Vt. Mar. 2003) (deciding whether superior court properly dismissed a civil conspiracy claim by "[a]ssuming that there continues to be an independent cause of action for the tort of civil conspiracy," but collecting cases from other jurisdictions in which civil conspiracy is only considered as a basis for imposing damages rather than a separate cause of action). Likewise, in a report and recommendation by Magistrate Judge Conroy, this Court noted that while "[i]t is not entirely clear under Vermont law whether the tort of civil conspiracy constitutes an independent cause of action," this Court has "issued decisions upon parties' claims of civil conspiracy in which it has been assumed that the claim constitutes an independent cause of action in Vermont." *Saunders v. Morton*, No. 5:09-CV-125, 2011 WL 1135132, at *9-11 (D. Vt. Feb. 17, 2011). Recently, Judge Reiss responded to this ambiguity by explaining that "a federal court sitting in diversity must predict how the state's highest court would decide the case." *Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, No. 2:16-CV-28, 2016 WL 7176586, at *15-16 (D. Vt. Dec. 7, 2016). The Court held that at this juncture, it "predicts that in certain circumstances, a civil conspiracy claim may be recognized under Vermont law." *Id.* Thus, this

Court's prior precedent suggests that the ambiguity expressed by the Vermont Supreme Court in *Davis v. Vile* will not preclude Plaintiffs' conspiracy claim.

Second, Defendants move to dismiss Plaintiffs' conspiracy claim against them on the ground that Plaintiffs have failed to allege that they employed illegal means to achieve an illegal purpose. According to MNI and McInnes, "Plaintiffs do not allege the Ratification is an 'illegal means,' and it is clear that there is nothing 'illegal' about [MNI] providing the Ratification to U.S. Bank or McInnes." ECF 134, p. 12-13. Plaintiffs respond that "USB and Defendants used a legal Ratification to effect the illegal forgery and collect on the stolen instrument, thus using legal means to effect an illegal purpose." ECF 140, p. 7. Thus, the parties essentially dispute whether, if USB's attempt to collect on the note and/or foreclose constitutes an illegal act, MNI's otherwise-lawful Ratification, intended to aid USB in doing so, would amount to conspiracy.

The Vermont Supreme Court has distinguished between the elements of civil and criminal conspiracy. *Boutwell v. Marr*, 42 A. 607, 609 (Vt. 1899). Although the crime of conspiracy may consist of the use of legal means to effect an illegal purpose, civil conspiracy requires "that the means used be illegal." *Id.* The decision from this Court cited by Plaintiffs for the

opposite proposition misquotes the Vermont Supreme Court's

holding in *Boutwell,* confusing the standard for criminal and

civil conspiracy. *See Catamount Radiology, P.C. v. Bailey*, No.

1:14-CV-213, 2015 WL 5089104, at *3 (D. Vt. Aug. 27, 2015)

(holding that "[t]o state a claim for civil conspiracy under

Vermont law a plaintiff must allege the existence of a

combination of two or more persons to effect an illegal purpose,

either by legal or illegal means, or to effect a legal purpose

by illegal means" (internal quotation omitted)). Nevertheless,

numerous other decisions from this Court, both before and after

the decision in *Catamount Radiology*, have correctly noted the

distinction between civil and criminal conspiracy. *See Akerley

v. N. Country Stone, Inc.*, 620 F. Supp. 2d 591, 600 (D. Vt.

2009); *Saunders*, 2011 WL 1135132, at *10; *Dumont v. Corr. Corp.

of Am.*, No. 2:14-CV-209, 2015 WL 3791407, at *11 (D. Vt. June

17, 2015); *Mansfield Heliflight, Inc.*, 2016 WL 7176586, at *15.

Since Plaintiffs here do not contend that the means allegedly

employed by MNI and McInnes were unlawful, but instead rely on

an incorrect view of the law in making their argument, the Court

also grants the Defendants' motion to dismiss on this ground.

4.    *Leave to amend*

        Plaintiffs in this case have not sought leave to amend the

complaint affirmatively. Rather, they respond to Defendants'

assertion that leave to amend should be denied because "any

attempt by Plaintiffs to amend their [Third Amended Complaint] would be futile." ECF 134, p. 18. In reply, Defendants further assert that leave to amend may be denied where a party raises the issue informally in a brief filed in opposition to a motion to dismiss. ECF 141, p. 10. In the absence of a formal motion for leave to amend the complaint in a particular manner, the Court cannot analyze whether any proposed amendment would be futile. Accordingly, the Court rejects Defendants' request that all future leave to amend be denied, as such a request is premature at this point.

Moreover, "[c]omplaints dismissed under Rule 9(b) are "almost always" dismissed with leave to amend. In cases where such leave has not been granted, plaintiffs have usually already had one opportunity to plead fraud with greater specificity." *Luce v. Edelstein*, 802 F.2d 49, 56–57 (2d Cir. 1986). Similarly, "repeated failures to cure deficiencies by amendments previously allowed" may provide reason to deny leave. *Forman v. Davis*, 371 U.S. 178, 182 (1962); *see also Martin v. Dickson*, 100 F. App'x 14, 16 (2d Cir. 2004) (denying leave to amend a complaint which was "not plaintiff's first bite at the apple"). In this case, while Plaintiffs initially brought a declaratory judgment action against MNI, they brought a fraud claim against this Defendant for the first time in their Third Amended Complaint, after receiving the June 2016 Ratification. Thus, to the extent that

Plaintiffs may seek leave to amend to cure deficiencies concerning the fraud claim in particular in the future, the general rule against permitting repeated amendments on the same claim would not apply. As such, the Court denies the Defendants' request that leave to amend be denied in the future on the ground that any future amendment would not be Plaintiffs' first "bite at the apple."

### Conclusion

For the foregoing reasons, the Court **grants** Defendants' motion to dismiss both claims, ECF 134, but declines to deny leave to amend at this juncture.

Dated at Burlington, in the District of Vermont, this 8th day of June, 2017.

/s/ William K. Sessions III
William K. Sessions III, Judge
United States District Court
