```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                      DISTRICT OF VERMONT
```

PETER DERNIER and NICOLE       )
DERNIER,                       )
                               )
        Plaintiffs,             )
                               )
        v.                      )       Case No.: 2:16-CV-230
                               )
U.S. BANK NATIONAL             )
ASSOCIATION AS TRUSTEE FOR     )
CSMC MORTGAGE-BACKED PASS-     )
THROUGH CERTIFICATES, SERIES   )
2006-3, MORTGAGE NETWORK,      )
INC., and ROBERT A. MCINNES,   )
                               )
        Defendants.             )

**OPINION AND ORDER**

This case arises from Plaintiffs Peter and Nicole Dernier's attempt to identify the beneficial owner of the mortgage promissory note for the loan on their home, following their intentional failure to make payments on the note. Plaintiff's Third Amended Complaint ("TAC") asserts claims against three defendants. *See* ECF 111-5. The Court previously dismissed Plaintiffs' claims against Defendants Mortgage Network, Inc. ("MNI") and Robert A. McInnes ("McInnes"). *See* ECF 144. The remaining defendant--U.S. Bank National Association, as Trustee for CSMC Mortgage Backed Pass-Through Certificates, Series 2006-3 ("USB")--now moves for judgment on the pleadings. *See* ECF 147. For the reasons stated below, USB's motion for judgment on the pleadings is **granted**.

**FACTUAL BACKGROUND**

The factual and procedural background of this case was detailed in the Court's order dismissing the claims against Defendants MNI and McInnes. *See* ECF 144, p. 2-8. It will be summarized again here.

Plaintiffs' TAC alleges irregularities in the transfer of both the note and the mortgage on their home. Plaintiffs claim that these irregularities resulted in confusion concerning who was authorized to modify the principle on their mortgage, receive payments on their note and, eventually, to foreclose on their property. After filing the original complaint in this action seeking to evidence the beneficial owner of their mortgage loan, Plaintiffs allege that they "uncovered a fraudulent scheme perpetrated by the banking industry . . . whereby they would exchange unendorsed promissory notes, hold them and only assign them to a particular trust once in default." ECF 111-5, p. 2. According to Plaintiffs,

> the trust in which their loan was eventually placed was a dumping ground for defaulted loans as a means to collect the trust's pooling insurance money for the benefit of the servicer of the trust and to allow the servicers of the trust to foreclose on the defaulted properties and keep the proceeds of any sales of the foreclosed properties.

*Id.*

In relation to these allegations, Plaintiffs lay out the following facts. First, Plaintiffs purchased a home in Weston,

2

Vermont in 2005. Kittredge Mortgage Corporation ("Kittredge") loaned Plaintiffs $242,250 for the purchase, and Peter Dernier executed a promissory note and a mortgage in favor of Kittredge on October 7, 2005. Kittredge immediately assigned the promissory note and mortgage to MNI. Later that fall, MNI informed the Derniers that the servicing for their loan would be transferred to Select Portfolio Servicing ("SPS"), and in April 2006, SPS notified them that it had "assigned, sold or transferred the servicing" to America's Servicing Company ("ASC"). In the spring of 2007, Plaintiffs sought a modification of the principal balance of their mortgage from ASC in response to well-water contamination discovered on their property. ASC allegedly informed Plaintiffs that they could only qualify for a modification if the loan was in default, and Plaintiffs ceased making loan payments at ASC's direction. Once the loan was in default, ASC informed Plaintiffs that the investor of the promissory note needed to agree to the modification.

At Plaintiffs' request, ASC produced a copy of the promissory note containing a specific indorsement from MNI to USB on February 26, 2009. *Id*. at 5. However, "the nature and context of the purported signature on the indorsement . . . immediately raised the suspicions of the Derniers." *Id*. The note that was produced purportedly bears two indorsements: one from Kittredge to MNI, and one from MNI in blank, which bears a

signature mark over a stamp and the name "Chad M. Goodwin," below. In April 2014, Plaintiffs obtained a signed, notarized affidavit from Chad M. Goodwin, stating that he was an employee of MNI from 2000 to 2013, and that the signature superimposed over the stamp is not his own.

In addition, after the Derniers filed their initial suit, attorney Josh Lobe, as counsel for USB, forwarded a letter to Plaintiffs with a copy of the promissory note bearing an indorsement from MNI to USB. *Id*. at 6. However, between late 2013 and early 2015, Plaintiffs received separate copies of the original promissory note from SPS, ASC, and MNI, respectively, none of which contained either the stamp or signature indorsement in blank from MNI or the typewritten specific indorsement to USB. *Id*. at 10. Thus, Plaintiffs allege that "USB created the fraudulent documents as a means to show it is the holder of the note," *Id*. at 7, and that "MNI did not sell the Derniers' loan to . . . USB." *Id*. at 8.

Attorney Lobe also forwarded an assignment of the mortgage "from MERS as nominee for Kittredge to a trust with a similar name as the Trust for which USB is a trustee in this matter," and claimed USB had authority to foreclose on the loan. *Id*. at 6. However, the date of the assignment of the mortgage which allegedly provided USB with standing to foreclose (March 18, 2011) occurred after ASC forwarded its file to outside counsel

4

to initiate foreclosure proceedings. *Id*. at 11. Moreover, the trust named on this assignment of the mortgage differed from the name of the trust on the note. In addition, Plaintiffs claim that ASC did not have the assignment from MERS to USB when they asked ASC for investor information on November 5, 2012. As such, the Plaintiffs claim that "upon information and belief, the March 18, 2011 Assignment of Mortgage was created and forged by Attorney Lobe's office." *Id*. at 11. Finally, they allege that "in August, 2013, ASC caused an assignment of mortgage from MERS as nominee for MNI to be recorded in the Town of Weston Land Records transferring the mortgage from MNI to USB," even though "the mortgage was not assigned directly by MNI to USB." *Id*. at 12.

Plaintiffs allege that "USB did not pay value for the Note and is therefore not a holder in due course of the Dernier loan." *Id*. at 13. Rather, the documents provided by USB as evidence of a financial transaction underlying the transfer of the note--identified as an "MNI Wire Transfer Receipt" and documents related to a "Pooling and Servicing Agreement (PSA)" for the trust (of which USB was presumably trustee)--do not indicate that USB paid value for the note. The MNI Wire Transfer Receipt "purportedly notes the Dernier loan as part of bulk sale by MNI to an unidentified purchaser" and "shows payment from an unidentified payee" dated December 5, 2005. *Id.* However, the

5

specific indorsement from MNI lists a trust that "was not established or filed with the SEC until March 1, 2006 at the earliest." *Id.* at 15. Furthermore, according to the complaint, USB stated that it acquired the Dernier note from the depositor named in the PSA, which is identified in the PSA as "Credit Suisse First Boston Mortgage Securities Corp." However, "the Derniers' Note does not bear any intervening indorsements reflecting conveyance of the Note from the depositor or seller listed on the PSA." *Id.* at 14.

Finally, Plaintiffs assert that "on June 29, 2016, [McInnes], on behalf of MNI, executed a Ratification and Consent ("Ratification") of the forged MNI stamp indorsement and forged signature of Chad M. Goodwin and attached it to the version of the Note with the specific indorsement from MNI to USB." *Id.* at 15. However, Plaintiffs claim that in reality, "MNI did not indorse or intend to indorse the Note to USB as Trustee when it received payment from an unidentified payer in December 2005 because there was no such trust by that name at that time." *Id.* Nor was the note indorsed in blank at that time. Rather, they allege that USB provided the note with the forged indorsement to MNI, and that "USB requested the Ratification from MNI for the purpose of satisfying the UCC requirement to become a holder of the Note." *Id.* at 16. Thus, neither the forged indorsement stamp

6

from MNI nor the forged signature of Mr. Goodwin were applied by another agent of MNI.

The last allegation in Plaintiffs' complaint is that the Derniers' payments on their loan to ASC "were not deposited in a specific account for the Trust which purportedly held their Note," leaving them with "no expectation that payments actually were applied to the certificateholders of the trust and properly credited." *Id.* at 17. In addition, Plaintiffs allege that "ASC had no right to seek collection from the Derniers for the Note on behalf of USB." *Id.* at 18. Furthermore, Plaintiffs assert that USB's negative reports about the Derniers to credit bureaus were fraudulent.

In light of the foregoing assertions, the Derniers brought claims for declaratory judgment seeking to quiet title on their property and a discharge of their mortgage. They also brought claims of unjust enrichment, common law fraud, mail fraud and RICO violations, violations of the Fair Debt Collection Practices Act and Fair Credit Reporting Act against USB. Finally, they brought a count of conspiracy to commit fraud and fraud against USB, MNI, and McInnes, alleging that these Defendants "conspired to ratify a forged indorsement in order for USB to claim ownership of the Note," even though "USB knew the endorsement on the Note was a forgery." *Id.* at 21. They assert that "the fraudulent Ratification has caused injury to

7

Plaintiffs by allowing USB to claim it's the holder of the Note and seek collection on a debt for which it paid no value." *Id.* at 22.

Defendants McInnes and MNI moved to dismiss this last count, arguing that (1) Plaintiffs failed to allege that MNI and McInnes acted in concert with USB to use illegal means to obtain an unlawful result, thereby precluding the conspiracy claim; and (2) Plaintiffs' fraud claim is defective because it does not contain allegations supporting the required elements of reliance and damages. On June 8, 2017, the Court dismissed this last count against McInnes and MNI, holding that Plaintiffs failed to adequately plead reasonable reliance or damages to sustain a fraud claim and failed to plead unlawful acts to sustain Plaintiffs' conspiracy to commit fraud claim. *See* ECF 144.

On October 11, 2017, USB moved for judgment on the pleadings, arguing that the Court should dismiss the TAC with prejudice because the Ratification bars Plaintiffs' claims and because Plaintiffs otherwise fail to state a claim as a matter of law. This Ratification, dated June 29, 2016 was executed by McInnes on behalf of MNI and states:

> Mortgage Network, Inc. . . . as the payee on the [Note] . . . hereby ratifies and approves the indorsement of the Note by Chad M. Goodwin, pipeline manager for Mortgage Network, Inc. Mortgage Network, Inc. was fully compensated for the transfer of the Note and Mortgage Network, Inc. hereby waives and/or releases any claims it may have on the Note.

TAC, Ex. Q. USB explains that "[a]ll of the counts contained in the TAC are premised upon the argument that MNI's transfer of the Note to U.S. Bank, as Trustee was ineffective." USB contends that since MNI has now ratified the allegedly forged signature on the indorsement of the note to USB, the indorsement becomes effective as of the date it was originally signed. USB argues that under 9A V.S.A. § 3-403, the note is deemed to be validly indorsed by MNI and therefore USB is authorized to enforce the Note.

## DISCUSSION

I. Legal Standard

A motion for judgment on the pleadings pursuant to Rule 12(c) is subject to the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (citing Fed. R. Civ. P. 12(c)). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "where the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id*. at 679.

In addition, Plaintiffs alleging fraud must satisfy the pleading requirements set out in Fed. R. Civ. P. 9(b). Specifically, Plaintiffs "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

**II. Analysis**

Plaintiffs' TAC asserts seven counts against USB: declaratory judgment (Count I), unjust enrichment (Count II), common law fraud (Count III), mail fraud/RICO violation (Count IV), violations of the Fair Debt Collection Practices Act (Count V), violations of the Fair Credit Reporting Act (Count VI), and conspiracy to commit fraud and fraud (Count VII). At the outset, the Court recognizes that the situation with the note in this case is quite convoluted. The Court, however, is unpersuaded by Plaintiffs' attempt to argue that no entity owns the note and that their mortgage should therefore be completely discharged. Plaintiffs clearly took out a mortgage to purchase their house. According to the notes attached to the TAC, there are only two possible owners of the note: MNI or USB. MNI has expressly "ratifie[d] and approve[d] the indorsement" and has "waive[d]

and/or release[d] any claim it may have on the Note." TAC Ex. Q at 2. There is no other entity besides USB asserting that it owns the note. MNI's ratification of the transfer of the note from MNI to USB renders each of Plaintiff's claims implausible. Thus, USB's motion for judgment on the pleadings is granted.

**A.   Plaintiffs' Claims Fail Due to the Ratification**

**1. Count I: Declaratory Judgment**

Plaintiffs are seeking a declaratory judgment that no entity is entitled to enforce the note and mortgage on their house because there was an ineffective transfer of the note to USB. In this first count, Plaintiffs assert that "Plaintiffs obtained a loan from Kittredge and provided a mortgage on their property as security for the loan"; "Kittredge subsequently sold and assigned the rights to the Dernier loan to MNI"; "MNI was fully compensated for the Dernier loan and no new entity has come forward as the rightful owner of the loan"; and therefore "Plaintiffs seek a quiet title on their property and discharge of the Mortgage." ECF 111-5, p. 18-19. Essentially, Plaintiffs argue that the initial transfer of their Note from MNI to USB was invalid due to the forged signature and that there has not been an effective ratification of that invalid transfer.

Plaintiffs make two specific points in support of this argument. First, Plaintiffs state that "there can be no ratification where, at the time of the purported transaction

being ratified, the alleged contract was impossible." ECF 150, p. 9.[1] Plaintiffs' point here is that USB did not exist "at the time of the purported transaction being ratified" because it "did not exist until March 1, 2006." *Id*. Second, Plaintiffs argue that "[n]ot only does the impossibility of the transaction render the attempted ratification to be ineffective, but in addition, MNI purportedly transferred the note to another entity – Credit Suisse – in 2005." *Id*. at 9-10.

Both of these arguments fail. First, even if USB (which is a trust) was not created until after the initial assignment, Vermont's UCC states that a negotiable instrument payable to a "trust . . . is payable to the trustee." 9A V.S.A. § 3-110(c)(2)(i). U.S. Bank--which clearly existed at the time of the assignment--could negotiate the note on behalf of USB (the trust). Second, Plaintiffs are relying on a screenshot of MNI's internal database which reflects a transfer of the note to Credit Suisse. Notably, Plaintiffs do not allege that the note was ever indorsed to Credit Suisse, and none of the copies of the note attached to the TAC contain an indorsement to Credit Suisse. According to Vermont's UCC, a negotiable instrument, such as Plaintiffs' note, is only owned by a payee of a special indorsement or the holder of the note if indorsed in blank. *See*

---

[1] In support of this argument, Plaintiffs cite a New York state case from 1830 as well as two Third Circuit cases.

9A V.S.A. §§ 3-205(a), (b). Plaintiff has not alleged that the note was indorsed by Credit Suisse nor do any of the notes attached to the TAC contain an indorsement to Credit Suisse. Plaintiffs only allege that MNI's internal database shows a transfer to Credit Suisse. This screenshot of the internal database is insufficient to show that the note was transferred to Credit Suisse.

Vermont's UCC permits a negotiable instrument signed by a party "without actual, implied, or apparent authority" to be effective if later ratified. *See* 9A V.S.A. §§ 1-201(b)(41), 3-403. As detailed above, MNI explicitly ratified and approved the indorsement of the note to USB. *See* TAC, EX. Q. MNI stated that it was fully compensated for the note and waived any claims it may have on the note. *See id*. Therefore, there has been an effective ratification of the transfer of the note to USB.

Thus, Plaintiffs are not entitled to declaratory judgment that no entity is entitled to enforce the note and attendant mortgage.

### 2. Count II: Unjust Enrichment

In order to prove its unjust enrichment claim, Plaintiffs must show that "(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Ctr.*

*v. Mad River Corp.*, 151 Vt. 408, 412, 561 A.2d 90, 93 (1989). Based on the Ratification, USB is the holder of the note, and Plaintiffs necessarily will fail to prove that it was inequitable for USB to receive Plaintiffs' payments that were obligated by the note. Thus, Plaintiffs have failed to assert a plausible claim of unjust enrichment.

### 3. Count III: Common Law Fraud

Plaintiffs must plausibly plead five elements for a fraud claim: "(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed. *Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 13, 200 Vt. 465, 472, 133 A.3d 836, 842 (2015) (citation omitted). Importantly, "[f]ailure to prove any one of the five elements defeats the fraud claim." *Id*. Due to the Ratification, Plaintiffs are unable to plausibly claim that its reliance on USB's representation that it was the holder of the note caused it any damages. Further, Plaintiffs cannot plausibly plead that USB knowingly misrepresented a material fact. USB clearly believes that it is the rightful holder of the note. Through the Ratification, MNI reaffirmed its intent to transfer the note to USB, and USB reaffirmed its understanding that it was the holder of the note.

Thus, Plaintiffs have failed to assert a plausible claim of common law fraud.

### 4. Count IV: Mail Fraud/RICO Violation

Plaintiffs allege that "USB devised a scheme to fraudulently convey the Note to the Trust and collect payments from Plaintiffs"; "USB and its agents systematically used the U.S. Mail for the purpose of providing fraudulent statements to Plaintiffs to carry out their scheme"; and "[a]s a result of USB's scheme, Plaintiffs have been damaged by their paying USB in excess of $65,000 for payment on the fraudulent statements provided to them." ECF 111-5, p. 20.

In order to plead a plausible RICO claim, Plaintiffs must demonstrate that USB engaged in a "pattern of racketeering activity." *See* 18 U.S.C. § 1962. The Second Circuit has explained that "[w]here an alleged RICO 'enterprise primarily conducts a legitimate business, there must be some evidence . . . that the predicate acts'—which must be in furtherance of fraud in order to constitute mail . . . fraud—'were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487-89 (2d Cir. 2014) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999)).

As discussed above, the transfer of the note to USB has been effectively ratified by MNI. While there was a question of the validity of the transfer based on the allegedly forged signature, the transfer of the note to USB became effective due to the Ratification. Thus, nothing USB has done with respect to the Plaintiffs' mortgage can now serve as a predicate act for Plaintiffs' alleged mail fraud/RICO violations. Therefore, Plaintiffs have failed to assert a plausible mail fraud/RICO violation.

### 5. Count V: Violations of the Fair Debt Collection Practices Act

A "debt collector" is defined by the Fair Debt Collection Practices Act ("FDCPA") as any person who "regularly collects or attempts to collect . . . debts owed or due . . . *another*. 15 U.S.C. §1692a(6) (emphasis added). Here, the Ratification establishes that USB purchased a preexisting debt and then attempted to collect on that debt. Since the FDCPA only applies to an entity that attempts to collect on another entity's debt, the FDCPA is not applicable to USB here. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721–22 (2017). Thus, Plaintiffs have failed to assert a plausible FDCPA claim.

### 6. Count VI: Violations of the Fair Credit Reporting Act

Plaintiffs assert that USB violated the Fair Credit Reporting Act ("FCRA") by reporting negative information about

Plaintiffs to national credit bureaus. Plaintiffs allege that the reports were "false and fraudulent" since USB did not own their note. The FCRA prohibits furnishers of consumer credit data from providing "any information relating to a consumer to any consumer reporting agency if the [furnisher] knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(1)(A). As the Ratification establishes that USB owned the note, it was within USB's rights to report Plaintiffs' failure to make payments on the note. Further, Plaintiffs admit in their TAC that they defaulted on their mortgage loan--therefore, USB's reporting of Plaintiffs failure to make payments was accurate. *See* ECF 111-5, p. 4.

Thus, Plaintiffs have failed to assert a plausible FCRA claim.

### 7. Count VII: Conspiracy to Commit Fraud and Fraud

In their TAC, Plaintiffs allege that USB, MNI, and McInnes conspired to ratify the forged indorsement of the Note. The Court has already dismissed Plaintiffs' claims with respect to MNI and McInnes. *See* ECF 144. In that order, the Court explained that "Plaintiffs failed to demonstrate how they specifically relied on the Ratification" and that "Plaintiffs fail to point to any type of harm caused by their justifiable reliance which suffices to give rise to a fraud claim under state law." *See* ECF 144, p. 14 and 17. For the same reasons articulated in the

Court's prior order, Plaintiffs fraud claims against USB also fail.

## CONCLUSION

For the reasons stated above, USB's motion for judgment on the pleadings is **granted**. As Plaintiffs have already had multiple opportunities to amend, the TAC is dismissed with prejudice and without leave to amend.

DATED at Burlington, in the District of Vermont, this 8th day of May, 2018.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
